**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES *ex rel.* MELISSA STAGGERS and RHONDA KURDELMEYER,** | ) ) ) ) ) | |
| **Plaintiffs-Relators,** | ) ) | |
| **v.** | ) ) | **Case No. 15-cv-392 (TSC/GMH)** |
| **MEDTRONIC, INC.,** | ) ) | ███████████ [1] |
| **Defendant.** | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

In this action under the False Claims Act, Plaintiffs-Relators Melissa Staggers and Rhonda Kurdelmeyer ("Relators") seek remedies under Rule 37(e) of the Federal Rules of Civil Procedure to cure the destruction of electronically stored information ("ESI") in the possession of Defendant Medtronic, Inc.[2]  The undersigned finds that Relators are not entitled to curative measures or sanctions for the loss of records due to a confluence of unusual circumstances related to the migration of Medtronic's data from one storage platform to another; however, they are entitled to curative measures for loss of records traceable to untimely-imposed legal holds.  Accordingly, Relators' motion is granted in part and denied in part.

---

[1] Because the parties' papers are filed under seal, this opinion is also so filed.  The parties will be ordered to confer on reasonable redactions so that a version of this opinion may be filed on the public docket.

[2] The filings most relevant to this Memorandum Opinion and Order are (1) Relators' motion and accompanying papers, ECF Nos. 226 and 227 through 227-70; (2) Medtronic's opposition and accompanying papers, ECF Nos. 229 through 229-11; and (3) Relators' reply and accompanying papers, ECF Nos. 231 through 231-7.  The page numbers cited herein are those assigned by the Court's CM/ECF system.

## I.    BACKGROUND

### A.    Relators' Claims

Relators are two former sales representatives who marketed and sold Medtronic's product InterStim, a surgically implantable device that stimulates the sacral nerve for the treatment of incontinence.  *See* ECF No. 18, ¶¶ 8–9, 23–24.  In this action, they allege that Medtronic "engaged in fraudulent conduct, resulting in the submission of false Medicare claims by physicians in connection with . . . InterStim."[3]  *United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-cv-392, 2019 WL 13132849, at *1 (D.D.C. Mar. 25, 2019) [hereinafter *Staggers I*].  As described by Judge Chutkan in her opinion granting in part and denying in part Medtronic's motion to dismiss, the "theory of liability" remaining in this case

> essentially alleges that Medtronic purposefully causes treating physicians to submit Medicare claims for InterStim implantation, which falsely certify that the implantation is documented as medically necessary in accordance with Medicare regulations.  The pertinent regulation provides:
>
>> [b]efore a patient is eligible for permanent implantation, he/she must demonstrate a 50% or greater improvement through test stimulation. Improvement is measured through voiding diaries.  Patient must be able to demonstrate adequate ability to record voiding diary data such that clinical results of the implant procedure can be properly evaluated.
>
> As this regulation makes clear, medical necessity must be demonstrated on the basis of "voiding diaries."  Nonetheless, Relators' First Amended Complaint alleges in comprehensive particularity how Medtronic has thoroughly insinuated itself into the doctor-patient relationship, so that doctors delegate to Medtronic representatives the responsibility for assessing symptom improvement during the testing period even though Medtronic's assessments are not based on the examination of patients' diaries, as the regulation requires.

---

[3] The United States declined to intervene and "take over the action" pursuant to 31 U.S.C. § 3730(b)(4)(B).  *See* ECF No. 6.  Therefore, it is being conducted by Relators.

*Id.* at \*2 (internal citation omitted) (quoting The National Coverage Determination for Sacral Nerve Stimulation for Urinary Incontinence (Publication No. 100-3, Manual Section No. 230.18, Version 1, Effective Date Jan. 1, 2002)).

More specifically, the operative complaint alleges that Defendant's sales representatives "targeted medical practices to offer InterStim treatment," emphasizing that it "is covered and generously reimbursed" by Medicare and that financial rewards can be expected from "pursuing InterStim testing and treatment." ECF No. 18, ¶¶ 47, 56. Defendant developed and trained sales representatives to use "a standardized selling approach" that included offering to provide valuable services to the physicians without charge, including patient solicitation and screening, monitoring, surgical preparation, and follow-up care. *Id.*, ¶¶ 50–55. According to Relators, much of the information sales representatives provided to patients to encourage them to undergo testing for potential implantation was misleading. *See id.*, ¶¶ 69–77. Then, in 2013, Defendant created a new unit known as Support Link[4] to "interact with the patients by telephone" during the testing phase. *Id.*, ¶¶ 85–86. Support Link staff were directed to urge physicians to sign a "standing order" form through which doctors "delegate[d] to SupportLink Representatives the responsibility to 'assess symptom relief' and to 'document symptoms' during the testing phase." *Id.*, ¶ 86. Relators assert that Support Link personnel coached patients to report symptom improvement. *See id.*, ¶ 88. This conduct allegedly "cause[d] medical practices and facilities that provide InterStim testing and treatment to submit false claims for InterStim procedures and devices that were not medically necessary and did not qualify for Medicare coverage." *Id.*, ¶ 90.

---

[4] The amended complaint connects the two words—"SupportLink." *See, e.g.*, ECF No. 18 at 3. However, Relators' motion papers use two words—"Support Link," *see, e.g.*, ECF No. 227-2 at 13—as do Medtronic's, *see, e.g.*, ECF No. 229-2 at 9. The undersigned will use the two-word form except when quoting a source that uses the single-word form.

### B.   Relevant History

#### 1.   The Complaints and Phase 1 Discovery

Relators filed their original complaint in this case in March 2015 and, after the United States declined to intervene, served that complaint on August 29, 2016. *See* ECF No. 1; ECF No. 6; ECF No. 11. Shortly thereafter, Relators informed Medtronic of their intention to file an amended complaint. *See* ECF No. 13 at 1. That complaint—now the operative complaint—was filed on September 28, 2016. ECF No. 18. Upon Defendant's motion, Judge Chutkan stayed discovery pending a decision on Medtronic's contemplated motion to dismiss. *See* ECF No. 20; ECF No. 21; Minute Order (Oct. 27, 2016). Discovery was stayed from October 27, 2016, until March 25, 2019, when Judge Chutkan granted in part and denied in part Defendant's motion to dismiss, jettisoning Relators' theory that Defendant violated the False Claims Act by replacing InterStim devices before replacement was medically necessary and leaving intact the theory that Medtronic caused physicians to submit false Medicare claims through the scheme noted above. *See Staggers*, 2019 WL 13132849, at *2–3. In May 2019, after the parties filed their meet and confer statement pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Local Civil Rule 16.3, which outlined several disputes related to the extent, timing, and process of discovery, *see* ECF No. 42 at 6–9, the case was referred to then-Magistrate Judge Meriweather to oversee discovery. *See* Minute Order (May 3, 2019); Minute Entry (May 3, 2019).

Discovery stalled while the parties attempted to work out a discovery protocol, and the case was thereafter administratively stayed pending resolution of the parties' disputes concerning the parameters of discovery. *See* Minute Order (May 18, 2020); Minute Order (June 1, 2020); *see also United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-cv-392, 2024 WL 4492022, at *1–2 (D.D.C. Oct. 15, 2024) [hereinafter, *Staggers II*]. The stay was lifted and the case was reopened

on December 28, 2021, when Judge Chutkan entered an Order setting a plan for phased discovery. *See* ECF No. 94; Minute Order (Dec. 28, 2021). Under that Order, Phase 1 discovery covered the period beginning when each of the Relators began working as Medtronic sales representatives— May 1, 2008, for Rhonda Kurdlemeyer and June 1, 2010, for Melissa Staggers—through the date the original complaint was filed on March 18, 2015. *See* ECF No. 94-1 at 2–3. It began by identifying 100 InterStim patients for whom a Medicare claim was submitted and allowed discovery as to those patients, as well as (among other things) "Medtronic's relevant 'policies, procedures, sales training, marketing, physician education materials, and patient education materials'; materials distributed to Relators or offered at meetings to which Relators were invited 'pertaining to submission of claims to Medicare'; [and] relevant conduct of Medtronic supervisory or management personnel." *Staggers II*, 2024 WL 4492022, at *2 (quoting ECF No. 94-1 at 3–4). When such discovery was completed, the parties were permitted to file motions on whether a fact issue exists as to Medtronic's liability for causing false Medicare claims as to the Phase 1 patients and whether the record supported discovery regarding false claims nationwide. *See* ECF No. 94-1 at 4–5; *see also Staggers II*, 2024 WL 4492022, at *3.

In April 2024, Relators filed a motion contending that although Phase 1 discovery was not over, it had already provided "more than enough evidence to establish a genuine issue of fact as to every element" of the alleged false claims scheme and urging the Court to "allow nationwide discovery to go forward immediately." ECF No. 151-2 at 6. Indeed, that motion claimed that the discovery to date had shown the "false claims rate for the Phase 1 physicians" was "more than 90%." *Id.* at 9 (emphasis omitted). While that motion was pending, Judge Meriweather was appointed to the Court of Federal Claims and the case was referred to the undersigned to oversee discovery in July 2024. *See* Minute Entry (July 29, 2024). Without addressing the merits of

Relator's argument that they had already developed sufficient evidence to defeat any summary judgment motion that could be filed by Medtronic, the undersigned denied the motion to commence nationwide discovery finding Relators had not shown good cause to modify the phased discovery order. *See Staggers II*, 2024 WL 4492022, at *1, *9. Accordingly, Phase 1 discovery proceeded. It is now complete, and Medtronic has filed a motion for summary judgment. *See* ECF Nos. 242–243.

> 2. Medtronic's Transition from Enterprise Vault to Microsoft Exchange Server 2013 and its Complications

Before and during the events outlined above, and unrelated to them, Medtronic was engaged in a project to transition from archiving emails in a storage system known as Enterprise Vault, which the company had used since 2007, to archiving them in Microsoft Exchange Server 2013 ("Microsoft Exchange").[5] *See* ECF No. 229-9, ¶¶ 3–4. The transition was necessary because Enterprise Vault, which retained emails indefinitely, was not meant to support the volume of archived emails (over one billion), and because, for security and privacy reasons, Medtronic had established a two-year email retention policy in 2013, which Enterprise Vault was incapable of enforcing. *See id.*, ¶¶ 3–4. Planning for the transition began in 2013 and the migration commenced in May 2015 led by the so-called " ███████ team." *See id.*, ¶¶ 6, 11. Because of the volume of data and the scores of thousands of employees whose data needed to be transferred, email boxes were copied in batches from Enterprise Vault to Microsoft Exchange between May 2015 and 2018, with the transition of U.S. employees completed in 2017. *See id.*, ¶¶ 7, 20. Enterprise Vault was

---

[5] Later, the archive was transitioned to Microsoft cloud-based storage. *See* ECF No. 229-9, ¶ 10. That transition is not relevant to the issues before the undersigned.

decommissioned in early 2021; any communications that had not been archived in Microsoft Exchange were lost when the application was uninstalled on February 9, 2021. *See id.*, ¶ 22.

Prior to the migration of a custodian's mailbox to Exchange, Enterprise Vault continued to automatically ingest that custodian's emails; once the migration of a mailbox was complete, the custodian's emails were archived only in Microsoft Exchange and were generally subject to the two-year retention policy. *See id.*, ¶ 8. Accordingly, for most current employees—apparently, emails of those who were no longer employed by Medtronic when the transition began were generally not copied to Microsoft Exchange—only two years of emails were copied from Enterprise Vault to Microsoft Exchange. *See id.*, ¶¶ 9, 19(a).

The process was different for employees—whether current or former—subject to legal holds, however.[6] When members of Medtronic's ██████████████ teams requested a legal hold over a custodian's electronic communications, personnel on Medtronic's ████████ team entered the pertinent information into the company's legal hold system form. *See* ECF No. 229-6, ¶ 3. The submission of the form triggered an email to the custodian and automatically placed the custodian's profile on an active hold by placing a flag on that person's Active Directory account, which is "a user account that allows network users in an enterprise to log into various systems utilized by the enterprise (laptops, training, HR portals, shared sites), while maintaining security and permissions for the user across the network." ECF No. 229-9, ¶ 12 n.4; *see also* ECF No. 229-6, ¶ 3. That flag "ensure[d] that, system-wide, records related to a custodian's account [would] be preserved." ECF No. 229-9, ¶ 13. For employees whose accounts had been flagged for a legal hold at the time of the migration of their emails, all records were to be copied from Enterprise

---

[6] Legal holds could be placed on a custodian's account for "various types of litigation (product liability, IP, Patent, Commercial, etc.), an internal investigation, a response to a government request, a response to a subpoena (including a third-party subpoena), as well as employment and compliance related matters." ECF No. 229-6, ¶ 8 n.4.
.

Vault to Microsoft Exchange and were excepted from the two-year retention policy; instead, the records were retained until the employee was no longer subject to any legal hold, at which time the two-year retention policy kicked in and any record more than two years old was deleted. *See* ECF No. 229-9, ¶ 9. According to Medtronic, company-wide, its personnel "copied more than one billion records from Enterprise Vault to Microsoft Exchange for more than 75,500 custodians," between 2015 and 2020. *Id.*, ¶ 20.

To address employees who were put on legal holds after their accounts had been transitioned, the Collab-Tech team devised a "lookback" process by which its personnel would return to Enterprise Vault and copy all the employee's data from that system to Microsoft Exchange. *See id.*, ¶ 11. To do so, the ███████ team ███████████████████████ ██████████████████████████████████████████████ *Id.*, ¶ 14. That process was performed "intermittently" until October 2020, when it was discontinued. *See id.*, ¶ 11. In the three months prior to discontinuance of the lookback process, the ██████ team copied more than 202 million records for over 14,000 custodians who were on legal hold for various matters from Enterprise Vault to Microsoft Exchange. *See id.*, ¶ 20. The process was imperfect, however. For example, it was Medtronic's practice for its ███████████ ████████ team—███████████████████████████████████████████to delete a custodian's ██████████ between 90 and 180 days after the custodian left Medtronic. *See id.*, ¶ 12 & n.5. If a legal hold was placed on an employee whose ██████████ account had already been deleted by the ███████████████████ team following an employee's departure, the ██████ team would be unaware of the hold, because the ███████████ tool would not return that account. *See id.*, ¶ 15. In that situation, Medtronic says a lookback would be performed only if "an issue with a particular custodian was raised at the time that documents

were collected for a matter." *Id.* More, if a custodian was subject to one or more legal holds at the time of the account's migration to Microsoft Exchange and then all legal holds were dissolved, Medtronic's record retention policy would kick in automatically through an electronic process and delete records more than two years old. *See id.*, ¶ 16; ECF No. 229-6, ¶ 4. If that custodian were later placed on legal hold in another matter, the ▮▮▮▮▮ team "may have mistakenly excluded them" from the lookback process because records would show that the custodian's full mailbox had been migrated from Enterprise Vault to Microsoft Exchange, thus making a lookback appear unnecessary. ECF 229-9, ¶ 16.

When Medtronic became aware of the ▮▮▮▮▮ issue during the transition process, it created a process for capturing the emails of employees subject to legal holds whose ▮▮▮▮▮ account had been deleted. *See id.*, ¶ 18. When Medtronic's ▮▮▮ team informed its ▮▮▮▮▮ team of such a custodian, the ▮▮▮▮▮ team would attempt to reconstruct that employee's ▮▮▮▮▮ account so that the data could be migrated from Enterprise Vault to Microsoft Exchange. *See id.* Needless to say, the lookback process and ▮▮▮▮▮ reconstruction were complicated and "labor-intensive." *Id.*, ¶¶ 11–12, 18. Efforts were further hampered because the Enterprise Vault had become unstable and searches of it unreliable because of the volume of emails in vault, its age, and the fact that the version Medtronic used was no longer supported by the vendor. *See* ECF No. 229-5 at 12–13, 116–17. More, Medtronic maintains legal holds for more than a thousand matters at any given time and, during the period in question, tens of thousands of custodians were subject to legal holds. *See* ECF No. 229-6, ¶¶ 7–8. Given these challenges, and despite its efforts, Medtronic has identified four categories of custodians in this case whose data was likely partially or totally lost:

1.    employees who left Medtronic before the transition process and were not subject to a legal hold during their tenure at Medtronic, whose Enterprise Vault mailboxes were therefore not migrated to Microsoft Exchange and whose ████████ accounts were deleted before a legal hold was placed;

2.    employees who left the company after their mailboxes were migrated to Microsoft Exchange and who became subject to a legal hold after their ████████ accounts were deleted;

3.    employees who were subject to a legal hold during the transition so that their entire Enterprise Vault mailbox was migrated to Microsoft Exchange but who thereafter had the hold lifted, resulting in application of the two-year document retention policy, and who were placed on a legal hold in a different matter after the older emails were deleted from Microsoft Exchange and Enterprise Vault was decommissioned; and

4.    employees who were subject to a legal hold during the transition so that their entire Enterprise Vault mailbox was migrated to Microsoft Exchange but who thereafter had the hold lifted, resulting in application of the two-year document retention policy, and who were placed on a legal hold in a different matter but were inadvertently missed during the lookback process.

ECF No. 229-9, ¶ 19.

Medtronic asserts that it first became aware of gaps in data related to this case in August 2021, when the company's ████████████████████ team, which is responsible for managing the collection and handling of ESI in response to litigation, first began "wide-ranging searches for custodial records" in anticipation of discovery in this action.  ECF No. 229-7, ¶ 6(d). Those searches showed that no emails were accessible in the email boxes of twelve Phase 1 custodians: Jason Christos, James Clausen, Nohemi Haben, Paul T. Harris, William Paul Harris, Cindy Kent, Annette Langer, Audrey Medlo, Amy Mroczek, Mike Neal, Jason Severn, and Michael Wittek.  *See* ECF No. 229-7, ¶ 9; ECF No. 227-5.  It was later discovered that there were gaps in the data for eight other custodians—Tom Bombeck, Bonnie Handke, Fred Kurtz, Annette Mittelmark, Jerry Santiago, Ryan Willemsen, Stephanie Wimmer, and Karen Howe.[7]  *See* ECF

---

[7] Those twenty custodians will be referred to as "impacted custodians."

10

No. 229-7, ¶ 9. All told, Medtronic placed holds on 672 custodians for this case and preserved the custodial email boxes of 602 of those. *See* ECF No. 229-2 at 20.

    3.    History of Legal Holds and Later Searches

As noted, Medtronic was served with the original complaint on August 29, 2016, and the amended complaint on September 28, 2016. ECF No. 1; ECF No. 18. The amended complaint, as detailed above, focuses on an alleged scheme in which sales representatives were trained to "insinuate themselves into physicians' practices" to encourage testing and implantation of InterStim even when not medically necessary, including through the Support Link program, in which Medtronic representatives interfaced with potential InterStim patients to encourage them to have the device implanted. *See* ECF No. 18, ¶¶ 42–45 (amended complaint's "Summary of Scheme"). On September 30, 2016, Medtronic placed 303 custodians on legal hold, including, as particularly relevant here, Tom Bombeck, a pelvic health marketing development strategist; Karen Howe, a sales administrative assistant; Michael Severn, an InterStim sales professional; and Ryan Willemsen, director of finance for InterStim and Medtronic's "Gastro/Uro" marketing group. *See* ECF No. 229-6, ¶ 5(a) & n.2; *see also* ECF No. 227-5, rows 1, 8, 17, 19. That initial hold included over 250 employees involved in sales and approximately 28 marketing professionals, two economics and reimbursement professionals, five training/education professionals, four medical/clinical specialists, and 11 administrative professionals. *See* ECF No. 229-6, ¶ 5(b). On October 17, 2016, Relators served their first set of requests for production ("RFPs"). *See* ECF No. 229-5 at 24–31. However, as noted, discovery was stayed on October 27, 2016, pending a decision on Medtronic's motion to dismiss. Minute Order (Oct. 26, 2016).

Between the date that Medtronic's motion to dismiss was resolved in March 2019 and the entry of the discovery protocol in December 2021 some discovery requests were promulgated.

11

Relators served their revised first set of RFPs on May 6, 2019, which included a request for documents "relating to communications with the U.S. Government related to Medicare reimbursement rates for InterStim-related products and services." *See* ECF No. 229-5 at 45. Between May 24, 2019, and July 10, 2019, Medtronic added 117 custodians to the legal hold, including impacted custodians Bonnie Handke, Fred Kurtz, Annette Langer, Jerry Santiago, Stephanie Wimmer, Michael Wittek, *see* ECF No. 229-6, ¶ 5(c)–(f)—according to Relators, all of whom were so-called "Health Economics Managers" (or "HEMs") dealing with Medicare reimbursement, *see* ECF No. 227-5, rows 5, 10–11, 16.[8]

The Relators served their first set of Interrogatories on March 13, 2020, which included interrogatories directed to identification of Medtronic employees with knowledge of the company's policies concerning training in marketing given to sales representatives, training given to physicians concerning selecting and testing patients for InterStim eligibility and implantation, and the development and implementation of the "standing order" process.[9] *See* ECF No. 229-5 at 54–55. On April 20, 2020, Medtronic added 39 individuals to the legal hold, including two impacted custodians, Jason Christos, a marketing director and Annette Mittlemark, who was involved in medical education; and at least two other personnel involved in medical education. *See* ECF No. 229-6, ¶ 5(g); ECF No. 227-5, rows 2, 13. Medtronic added another impacted custodian, Paul T. Harris, an InterStim district sales manager for North Carolina, and six others to the hold on June 26, 2020. *See* ECF No. 229-6, ¶ 5(h).

---

[8] Santiago and Wimmer were also identified in Medtronic's May 20, 2019, initial disclosures as individuals likely to have discoverable information. *See* ECF No. 227-38 at 5; Minute Order (May 3, 2019) (setting May 20, 2019, as the deadline to exchange initial disclosures). The only other impacted custodian named in Medtronic's initial disclosures is Willemsen, *see* ECF No. 227-38 at 4, who was placed on legal hold in September 2016.

[9] As noted, Relators allege that, as part of Medtronic's scheme to "facilitat[e] the reporting of false voiding data," Support Link staff were directed to urge physicians to sign a "standing order" form through which doctors "delegate[d] to SupportLink Representatives the responsibility to 'assess symptom relief' and to 'document symptoms' during the testing phase." ECF No. 18, ¶¶ 85–86

The Order implementing phased discovery was entered on December 28, 2021.  *See* ECF No. 94.  By that point, Enterprise Vault had been decommissioned.  *See* ECF No. 229-9, ¶ 22.  On May 12, 2022, Relators served its second set of RFPs, which included a request for documents related to the creation of Support Link and its pilot project.  *See* ECF No. 229-5 at 69.  On July 7, 2022, Medtronic added three impacted custodians to the hold: James Clausen, Nohemi Haben, and Amy Mroczek—all of whom, according to Relators, worked on the Support Link pilot project.  *See* ECF No. 229-6, ¶ 5(j); ECF No. 227-5, rows 3–4, 14.

On August 30, 2022, Medtronic added to the hold impacted custodian Michael Neal, a Health Economics Manager, and 21 other custodians.  *See* ECF No. 229-6, ¶ 5(k); ECF No. 227-5, row 15.  Two other impacted custodians, Cindy Kent—during the relevant period a marketing director in the Gastro/Uro marketing group, then a vice president of marketing, and then a vice president and general manager of Gastro/Uro therapies—and Audrey Medlo, a national administrative services manager, were added on October 23, 2022, along with one other custodian.  *See* ECF No. 229-6, ¶ 5(*l*); ECF No. 227-5, rows 9, 12.  Impacted custodian William Paul Harris, a Health Economics Manager, was never added to the hold, apparently because of confusion between him and Paul T. Harris, who (as noted) was added in June 2020.  *See* ECF No. 229-7, ¶ 9 & n.4.

In total, Medtronic instituted legal hold over 672 custodians in connection with this litigation.  *See* ECF No, 229-6, ¶ 6.  After recognizing in August 2021 that data had been lost from the email boxes of the custodians relevant here, Medtronic conducted additional searches designed to identify "emails and other mailbox records" for those impacted custodians "that are preserved for this litigation in the mailboxes of other Medtronic employees placed on legal hold."  ECF No. 229-10, ¶¶ 3–4.  For each of the employees whose custodial email box was inaccessible, some

number—between a low of 1,154 for Haben to a high of 190,526 for Christos—of unique emails has been located through those additional searches in the preserved emails of other custodians. *See* ECF No. 229-11, table 1; ECF No. 227-70 at 6.[10]  For each of the custodians for whom there is a temporal gap in the preserved emails, some number—between a low of 17,390 for Willemsen to a high of 98,902 for Handke—of unique emails from the relevant gap has been located through those additional searches in the preserved emails of other custodians.  *See* ECF No. 229-11, table 2.

## II.    LEGAL STANDARD

The subsection of Rule 37 of the Federal Rules of Civil Procedure addressing the loss of ESI was substantially reworked in 2015.  The earlier standard adopted in 2006 applied only to "information lost due to the 'routine operation of an electronic information system'" and, as long as the operation was in "good faith," required a showing of exceptional circumstances before sanctions could be imposed.  Fed. R. Civ. P. 37(f) advisory committee's note to 2006 amendment; *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  The new version of the rule recognizes the "limited" nature of the prior rule and now "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify [those] measures."[11]  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Specifically, the rule provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable

---

[10] For reasons that are unclear, the table created by Medtronic's eDiscovery vendor and attached as an exhibit to Medtronic's opposition brief does not include an entry for impacted custodian Kurtz.  *See* ECF No. 229-11.  However, there is an entry for Kurtz in a table previously created by the eDiscovery vendor and sent by Medtronic's counsel to Relators' counsel, when the parties were attempting to forestall the filing of a motion for sanctions.  *See* ECF No. 227-70 at 6.

[11] The parties agree that the standards of Rule 37(e) apply to this dispute.  *See* ECF No. 227-2 at 9 (Relators stating that "[t]he loss of electronic evidence stored on e-mails falls squarely within the scope of Rule 37(e), the terms of which specifically address the applicability of sanctions for spoliation of ESI" (quoting *Borum v. Brentwood Village, LLC*, 332 F.R.D. 38, 43 (D.D.C. 2019)); ECF No. 229-2 at 24 (Medtronic stating that "Rule 37(e) governs the imposition of sanctions for the alleged spoliation of ESI").

14

steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)    upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

>    (A)    presume that the lost information was unfavorable to the party;

>    (B)    instruct the jury that it may or must presume the information was unfavorable to the party; or

>    (C)    dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  That is, Rule 37(e)

has five threshold requirements: (1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time of the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery.  If any of these requirements are not met, then curative measures and sanctions are unavailable under Rule 37(e).

*DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (N.D. Ill. 2021) (internal citations omitted).  The burden is on the party requesting sanctions to establish those requirements. *See, e.g.*, *Borum v. Brentwood Village, LLC*, 332 F.R.D. 38, 43 (D.D.C. 2019) ("The party alleging spoliation bears the burden of proof.").

Only if the threshold requirements are met must the court determine "if the party seeking the ESI has suffered prejudice or if the party with possession, custody, or control of the ESI intended to deprive the seeking party of the ESI." *DR Distribs.*, 513 F. Supp. 3d at 958.  "The rule does not place the burden of proving or disproving prejudice on one party or the other," rather, it "leaves judges with discretion to determine how best to assess prejudice in particular cases."  Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment.  If prejudice is found, the court

may impose curative measures under Rule 37(e)(1), such as barring the spoliating party from presenting certain evidence or allowing the factfinder to "consider the circumstances surrounding the loss of the ESI." *DR Distribs.*, 513 F. Supp. 3d at 958. On the other hand, a party seeking one of the more severe sanctions under Rule 37(e)(2) has "the burden of proving 'intent to deprive,' rather than ordinary or gross negligence." *Borum*, 332 F.R.D. at 48 (quoting *Rhoda v. Rhoda*, No. 14 Civ. 6740, 2017 WL 4712419, at *2 (S.D.N.Y. Oct. 3, 2017)).

## III.    DISCUSSION

As to the threshold requirements of Rule 37(e), the parties focus on the fourth and fifth: whether the ESI at issue was lost because Medtronic failed to take reasonable steps to preserve it and whether the ESI can be restored or replaced by additional discovery.[12] The Court finds that, although Medtronic's management of the migration from Enterprise Vault to Microsoft Exchange was reasonably calculated to preserve relevant data, the company unreasonably (but unintentionally) added some custodians to the legal hold for this case in an untimely manner, resulting in loss of relevant data. At least some of that the data is neither replaceable nor

---

[12] All parties acknowledge that requirement one of Rule 37(e) is met because the material at issue is ESI. *See* note 11, *supra*. Although the parties argue over whether Medtronic instituted legal holds over certain custodians in a timely manner, they do so in the context of whether Medtronic took reasonable steps to preserve ESI, rather than in the context of requirement two, which is generally concerned with *when* the duty to preserve was triggered. *See* ECF No. 227-2 at 33–37 (Relators discussing the "absence of timely litigation holds" as evidence of Medtronic's "fail[ure] to take reasonable steps to preserve ESI"); ECF No. 229-2 at 27, 30–32 (same for Medtronic). As to whether the lost data was relevant, Relators point out that Medtronic itself, which was in the best position to know which custodians had relevant evidence, placed (or intended to place) the impacted custodians on legal hold so that such relevant evidence would be preserved. *See* ECF No. 231-2 at 21–22. More, each of the impacted custodians was chosen as a Phase 1 custodian, which strengthens the claim to relevance. Medtronic fails to answer that argument, merely pointing out that it has been able to recover some emails involving impacted custodians from the emails of other custodians. *See* ECF No. 229-2 at 33. But that is an argument that goes to whether the lost ESI can be replaced or restored through further discovery, not whether relevant ESI was destroyed in the first instance. Accordingly, the undersigned finds that Relators have met their burden to show that relevant data was destroyed.

recoverable. More, Relators have established that they were prejudiced by the unavailability of a subset of that data, entitling them to curative measures.

## A.    Reasonable Steps to Preserve

As noted, Rule 37(e) "applies only if the information was lost because the party failed to take reasonable steps to preserve the information"; "it is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. As the reasonableness standard implies, perfection is not required; indeed, the advisory committee's note emphasizes that "perfection in preserving all relevant electronically stored information is often impossible." *Id.* Thus, the mere fact that relevant data was lost does not mean that the party holding such data failed to take reasonable steps to preserve it. Indeed, even if a party—including a sophisticated party like Medtronic—"*could have* done more to ensure that no relevant ESI was lost," that does not mean the party was "*required* to take [such] additional measures to ensure preservation of ESI." *Burns v. Medtronic, Inc.*, No. 15-cv-2330, 2017 WL 11633269, at *4 (M.D. Fla. Aug. 9, 2017); *see also* The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendation & Principles for Addressing Electronic Document Production* [hereinafter, *The Sedona Principles*], 19 Sedona Conf. J. 1, 108 (2018) ("The preservation obligation for ESI does not impose heroic or unduly burdensome requirements on parties.").[13] Rather, a party is required only to take reasonable steps under the circumstances to preserve relevant ESI. *See, e.g.*, *The Sedona Principles*, 19 Sedona Conf. J. at 95 ("A reasonable balance must be struck between (1) an organization's duty to preserve relevant and discoverable evidence, and (2) an organization's need, in good faith, to continue

---

[13] "[T]he Sedona Conference, an industry thought leader in e-discovery, has long published guidance for lawyers on how to preserve and produce databases and database information." *Sound Around, Inc. v. Friedman*, No. 24-cv-1986, 2025 WL 2855353, at *4 (S.D.N.Y. Oct. 8, 2025). Many federal courts have found its guidance instructive. *See, e.g.*, *U.S. EEOC v. George Washington Univ.*, No. 17-cv-1978, 2020 WL 3489478, at *10 n.10 (D.D.C. June 26, 2020).

operations."); *see also, e.g., Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 525 (D. Md. 2010) ("Breach of the preservation duty, also, is premised on reasonableness: A party breaches its duty to preserve relevant evidence if it fails to act reasonably by taking 'positive action to preserve material evidence.' The action must be 'reasonably calculated to ensure that relevant materials will be preserved,' such as giving out specific criteria on what should or should not be saved for litigation." (citations omitted) (quoting *Jones v. Bremen High Sch. Dist. 228*, No. 08 C 3548, 2010 WL 2106640, at *6 (N.D. Ill. May 25, 2010)), *aff'd in relevant part*, No. 06-cv-2662, 2010 WL 11747756 (D. Md. Nov. 1, 2010)).

1.    The Migration Process and the Decommissioning of Enterprise Vault

The circumstances here appear to be unusual. As outlined above, Medtronic received notice of this litigation in late August 2016 when it was in the middle of a massive project to migrate its email archive from Enterprise Vault to Microsoft Exchange, in part to implement its recently instituted two-year document retention policy that was driven by a need to "protect the integrity of Medtronic's information governance and smooth operations" and address cybersecurity and privacy concerns. *See* ECF No. 229-9, ¶¶ 3–5. Two months after Medtronic was served with the original complaint, the Court stayed discovery, which remained effectively stayed for over five years, until late December 2021, by which time Enterprise Vault had been decommissioned. *See* Section II.B.1–2, *supra*.

It is worth noting at the outset that, even in scenarios involving data migrations less massive and less complicated than that presented here, courts have been hesitant to impose sanctions based on material lost because of technical issues with data migration. For example, in *Government Employees Health Association v. Actelion Pharmaceuticals Ltd.*, the court indicated that the fact that data is "inadvertently destroyed during migration despite a legal hold being in

place" does not indicate a failure to take "reasonable steps to preserve data" and specifically found that the company overseeing migration of data from one platform to another "took reasonable steps to preserve data" when it "employ[ed] appropriate personnel, methodology and consultants to do so." 343 F.R.D. 474, 483 (D. Md. 2023); *see also DR Distribs.*, 513 F. Supp. 3d at 959 n.55 ("ESI may have been lost when the former defense counsel's email system was migrated and when the hard drive containing the images of the four hard drives crashed. The Court is not imposing any sanctions for these unfortunate incidents. The evidence, if relevant, was not lost because of a failure to take reasonable steps to preserve it."); *Barn Light Elec. Co. v. Barnlight Originals*, No. 14-cv-1955, 2017 WL 11632537, at *8 (M.D. Fla. June 28, 2017) (stating, in a case where the plaintiff lost information through "server migrations, the e-mail servers and clients used by [the] [p]laintiff, and the e-mail retention policy," that although the plaintiff's "preservation and production efforts were not perfect, Rule 37(e) does not call for perfection but rather recognizes that 'reasonable steps' to preserve suffice." (quoting Fed. R. Civ. P. 37(e) advisory committee's notes to the 2015 amendments). During the data migration at issue here, Medtronic neither ignored nor abdicated its duty to preserve relevant ESI, but employed processes fairly calculated to preserve data subject to litigation holds. As the company points out, its Information Technology professionals "(1) copied all data for tens of thousands of custodians on legal holds from Enterprise Vault to Exchange; (2) copied two years' worth of data for tens of thousands of custodians not on legal holds from Enterprise Vault to [Microsoft] Exchange; and (3) devised and executed a plan to reconcile the mailboxes of the thousands of custodians placed on legal holds each year after their migration process was completed." ECF No. 229-2 at 28–29 (emphasis omitted). Then, when Medtronic realized there was an issue with custodians whose ███████████ accounts had been deleted because they had left the company, it devised a process to reconstruct those accounts to

recapture the data.  *See* ECF No. 229-9, ¶ 18.  Relators have provided no caselaw that would suggest Medtronic's efforts did not constitute "reasonable steps" to preserve relevant ESI.  Fed. R. Civ. P. 37(e); *see also, e.g.*, *The Sedona Principles*, 19 Sedona Conf. J. at 102 ("The law requires reasonable and good faith steps to preserve once the duty is triggered, not perfection."); *id.* at 108 ("The preservation obligation for ESI does not impose heroic or unduly burdensome requirements on parties.  Rather, the obligation to preserve normally requires reasonable and good faith efforts.").  And the Court finds that those steps were in fact reasonable, especially given the mammoth task Medtronic faced, which included the migration of over one billion records from more than 75,000 custodians.  *See* ECF No. 229-9, ¶ 20.

Relators contend, however, that Medtronic acted unreasonably when it decommissioned Enterprise Vault in 2021.  *See* ECF No. 227-2 at 26, 33.  As support, it cites two distinguishable cases.  *In re Petters Co.* concerned a bank's destruction of backup tapes as part of a "decommissioning project" of a legacy platform—Lotus Notes—in favor of a new one known as Legato.  606 B.R. 803, 811, 822 (Bankr. D. Minn. 2019), *aff'd sub nom. Kelley v. BMO Harris Bank N.A.*, 657 B.R. 475 (D. Minn. 2022).  There, the bank had been accused of abetting a Ponzi Scheme orchestrated by Petters Co. and was subject to a preliminary injunction prohibiting destruction of any records related to the company.  *See id.* at 809–10.  Nevertheless, the bank thereafter instituted a project decommissioning Lotus Notes.  *See id.* at 822.  In doing so, the bank does not appear to have made any attempt to ensure that relevant material was not destroyed. Rather, it replicated data from Lotus Notes onto a server running Legato knowing that, unlike Lotus notes, Legato "did not capture all information that was captured on the Lotus Notes system, including calendar events, attachments, and all other files contained in a given mailbox."  *Id.* at 811–12, 822.  It then destroyed the backup tapes containing the (more complete) Lotus Notes data.

20

*See id.* at 812.  In finding the destruction of the backup tapes unreasonable, the court pointed out that the decommissioning project did not commence until after the bank was subject to the injunction and that the bank knew that the backup tapes "were the only source" of certain data.  *Id.* at 822–23.  That is, unlike here, the bank instituted the decommissioning project while on notice of its duty to preserve material; more significantly—and also unlike here, where Medtronic devised and executed a plan intended to save data during migration—the bank made no effort to preserve unique data it knew to be on the backup tapes prior to their destruction.  Preservation efforts in *Estate of Moreno ex rel. Moreno v. Correctional Healthcare Cos.* were even more lackluster.  In that case, prior to instituting a document retention policy that would destroy emails after varying periods of time rather than storing them forever, as had previously been the case, the defendant's claims management group sent a single email to outside counsel asking for identification of any open cases and key witnesses in those cases.  *Est. of Moreno ex rel. Moreno v. Corr. Healthcare Cos.*, No. 18-cv-5171, 2020 WL 5740265, at *3–4 (E.D. Wash. June 1, 2020).  The claims management group made no effort to follow up or to identify relevant custodians on its own; rather it put a litigation hold on the single individual identified by outside counsel (a named defendant) and permanently deleted "[a]ll other emails and former employee email accounts."  *Id.* at *4.  More, the defendant's Chief Information Officer testified that one of the reasons the document retention policy was implemented was so that "bad emails" would be destroyed.  *Id.* at *5.  Under those circumstances, the court found the defendant had not taken reasonable steps to preserve ESI—a conclusion the defendants did not contest.  *See id.*  Again, that is a far cry from Medtronic's conduct here, which implemented a multi-pronged policy, including the processes for "lookbacks" and reconstructing deleted ███████████ accounts, to attempt to preserve relevant ESI.  Institution of that policy constituted "reasonable and good faith efforts" to retain relevant

21

information, *The Sedona Principles*, 19 Sedona Conf. J. at 93, and the fact that it functioned imperfectly—perhaps in part because multiple departments, including ██████████████ ███████████████, were involved in the company's management of electronic information—is not a reason to exercise the Court's discretion to impose curative measures or sanctions, *see* Fed. R. Civ. P. 37(e) (noting that a court "may" order such measures where "a party failed to take reasonable steps to preserve [ESI]" that "cannot be restored or replaced through additional discovery").

It is worth noting, too, that Medtronic first became aware of gaps in data related to this case in August 2021, when it began "wide-ranging searches for custodial records" related to this action. ECF No. 229-7, ¶ 6(d). By that time, Enterprise Vault had been decommissioned, *see* ECF No. 229-9, ¶ 22, in part because it was no longer technologically feasible to access and search it, *see* ECF No. 229-2 at 29; ECF No. 229-5 at 12–13, 116–17. Relators contend that revelation, which occurred more than five years after Medtronic was served with the complaint in this case, shows that the company "ignored its duty to monitor and ensure compliance with litigation holds." ECF No. 231-2 at 12; *see also, e.g.*, *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010) ("The duty to preserve evidence is an ongoing duty. Thus, the party—and its counsel—must monitor the party's compliance with the litigation hold, ensuring that all relevant actors understand the policy and are implementing it faithfully." (internal citation omitted)). But that disregards the circumstances. First, Medtronic used systems in which the flagging of accounts with legal holds was automated and, as noted, instituted hundreds of legal holds in this case. *See* ECF No. 229-6, ¶¶ 2–3, 5–6. Thus, it appears that the personnel requesting and instituting those holds understood the policy and implemented it. *See R.F.M.A.S.*, 271 F.R.D. at 24. Second, the migration process described above (which the undersigned has found to be reasonable) was itself instituted to "ensure

compliance" with legal holds. Third, and finally, it is unsurprising that Medtronic did not begin wide-ranging searches for relevant ESI until 2021, as discovery was stayed from 2016 to 2021. *See* Section II.B.1, *supra*. Although it may be "a better practice for a company to make a searching inquiry" to determine whether ESI has been preserved, "in light of the enormous demands that discovery places on any party" it was not unreasonable for Medtronic to assume that the processes it had implemented to preserve records subject to litigation holds were followed and functioned as intended "until the issue was brought to its attention." *La Belle v. Barclays Capital Inc.*, 340 F.R.D. 74, 84 (S.D.N.Y. 2022).

In sum, the undersigned finds that Medtronic's management of the migration processes— although certainly imperfect—and its decommissioning of Enterprise Vault struck a "reasonable balance" between its "duty to preserve relevant and discoverable evidence" and its "need, in good faith, to continue operations." *The Sedona Principles*, 19 Sedona Conf. J. at 95. Accordingly, the undersigned rejects Relators' argument that Medtronic did not take reasonable steps to preserve ESI from Enterprise Vault. Consequently, there can be no finding of spoliation of evidence from those custodians whose data was lost due only to the flawed transition to Microsoft Exchange and not because of an allegedly delayed legal hold—Thomas Bombeck, Jason Christos, Paul T. Harris, Karen Howe, Michael Severn, and Ryan Willemsen. *See* ECF No. 227-5, rows 1–2, 6, 8, 17, 19; *see also* ECF No. 227-7 (chart of custodians with allegedly delayed litigation holds). Those whose data was lost due to allegedly untimely legal holds are discussed next.

      2.      Timeliness of Litigation Holds

The reasonableness of Medtronic's migration processes and decommissioning of Enterprise Vault does not end the inquiry. Rather, the undersigned must still assess whether the company reasonably instituted legal holds over key custodians. *See, e.g.*, *Gov't Emps. Health*

*Assoc.*, 343 F.R.D. at 483 (finding that, although the personnel handling data migration took reasonable steps to preserve data, those in charge of instituting legal holds did not). Relators' arguments on this issue have more traction.

"The obligation to preserve relevant evidence is generally understood to require that the producing party make reasonable and good faith efforts to identify and preserve the information that is identified as relevant to the claims or defenses in the matter." *The Sedona Principles*, 19 Sedona Conf. J. at 94. As both the Sedona Conference and the Advisory Committee on Civil Rules recognize, the precise contours of a party's claim might not be evident at the outset of litigation. *See id.* at 96, 103; Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "[S]o long as the preservation decisions are made on the basis of reasonable belief and good faith, a party should not be faulted with the benefit of hindsight if claims are modified or expanded, requiring an adjustment of the preservation obligations." *The Sedona Principles*, 19 Sedona Conf. J. at 103; *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (stating that "[i]t is important not to be blinded" to the reality that "the scope of information that should be preserved" may be uncertain when a party is first put on notice of an obligation to preserve).

Relators have identified fourteen custodians they believe were not timely added to the legal hold in this case and consequently suffered a loss of data. *See* ECF No. 227-7 at 2. Medtronic counters that its additions of those individuals to the hold "were properly and timely implemented as additional information and allegations came to light." ECF No. 229-2 at 31. The remainder of this subsection addresses each of the fourteen custodians, some in groups and others individually.

### a.    *Health Economics Personnel Added in Mid-2019*

As noted, between May and July 2019, Medtronic added the following relevant individuals to the legal hold for this case: Bonnie Handke, Fred Kurtz, Jerry Santiago, Stephanie Wimmer,

and Michael Wittek. *See* ECF No. 229-6, ¶ 5(c)–(e).[14] Each of them dealt with Health Economics and Medicare reimbursement as either HEMs or higher-level management dealing with Medicare reimbursement. *See* ECF No. 227-5, rows 5, 10, 16, 18, 20. Relators maintain that Medtronic should have recognized the potential that each of those custodians would have relevant information when it instituted its initial legal holds for this case in September 2016 because health economics personnel were "Medtronic's internal experts on reimbursement matters." *See* ECF No. 227-2 at 27–30; ECF No. 231-2 at 15–16. Medtronic maintains that it was first put on notice that Health Economics Managers m[ight] possess information relevant to the operative complaint" when Relators propounded their revised first set of RFPs on May 6, 2019, which included a request for documents "related to communications with the U.S. Government related to Medicare reimbursement rates for InterStim-related products and services." ECF No. 229-2 at 31; ECF No. 229-5 at 45.

"A party's duty to preserve specific types of documents does not arise unless the party controlling the documents has notice of those documents' relevance. Usually, this notice arises from discovery requests or from the complaint." *In re Old Banc One S'holders Sec. Litig.*, No. 00 C 2100, 2005 WL 3372783, at *3 (N.D. Ill. Dec. 8, 2005). The original complaint contained an allegation asserting, "Medtronic employs economic managers to work with hospitals and physicians to ensure they have appropriate coding, billing, and reimbursement information. 'Economic managers' provide long-term billing advisory services as the physicians require, free of charge." ECF No. 1, ¶ 134. As Medtronic points out, that reference and the alleged kickback scheme it was pertinent to were excised from the amended complaint, which was filed a month

---

[14] Annette Langer is identified in one of Medtronic's declarations as "Reimbursement Manager." ECF No. 229-6, ¶ 5(f). However, in an answer to an Interrogatory, Medtronic asserts she supervised Support Link personnel. *See* ECF No. 227-55 at 7. Accordingly, she is addressed below in Section III.A.2.c, *infra*, with other Support Link personnel.

after Medtronic was served in this case.[15]  ECF No. 229-2 at 13.  A reasonable litigant might well take that—as Medtronic apparently did—as an indication that Health Economics Managers were not key players in the litigation.  *See id.* at 30–31; *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("The duty to preserve extends to those employees likely to have relevant information—the 'key players' in the case."); *The Sedona Principles*, 19 Sedona Conf. J. at 105 (stating that, in circumstances where a legal hold is appropriate, the notice will be "most effective when the organization focuses on identifying and notifying key custodians and data stewards most likely to have relevant ESI").  More, the amended complaint centers on Medtronic's alleged scheme to—as Judge Chutkan put it—"thoroughly insinuate[] itself into the doctor-patient relationship, so that doctors delegate to Medtronic representatives the responsibility for assessing symptom improvement during the testing period."  *Staggers I*, 2019 WL 13132849, at *2.  To be sure, Medicare reimbursement is a part of the alleged scheme, but the amended complaint gives little hint that "Medtronic's internal subject matter experts on Medicare coverage," ECF No. 227-2 at 28, would be "key custodians . . . most likely to have relevant ESI," *The Sedona Principles*, 19 Sedona Conf. J. at 105.  Rather, the operative complaint "alleges in comprehensive particularity" how the key players in that scheme were sales representatives like the Relators, Support Link personnel, and their managers.  *Staggers I*, 2019 WL 13132849, at *2; *see* ECF No. 18, ¶¶ 42–45 (Relators' "Summary of Scheme" alleging that Medtronic trains its "sales Representatives to take extraordinary measures to insinuate themselves into physicians' practices" and highlighting the Support Link "marketing program through which Medtronic asks physicians to agree to sign a 'standing order' delegating responsibility to SupportLink Representatives to assess the results of testing").

---

[15] Relators informed Medtronic that they would be filing an amended complaint at some point within the first two weeks after Medtronic was served.  *See* ECF No. 11; ECF No. 13 at 1.

As to discovery requests, Relators' initial RFPs, which were served on October 17, 2016, did not include requests that make clear that HEMs would be among the essential custodians in possession of relevant material; indeed, there is no mention of Medicare reimbursement in those RFPs.[16]  *See* ECF No. 229-5 at 24–33.  Because discovery was thereafter stayed, it appears that no further discovery requests were promulgated until Relators' revised first set of RFPs were served on May 6, 2019, which, as noted, asked for documents relating to Medicare reimbursement rates.  *See id.* at 36–47.  Within a month, Medtronic placed legal holds on Handke, Kurtz, Santiago, Wimmer, and Wittek.  *See* ECF No. 229-6, ¶ 5(c)–(e).  The undersigned finds that Medtronic placed those holds within a reasonable time after it became aware of the potential relevance of HEMs through the revised RFPs.

###### b.    *Health Economics Personnel Not Added in Mid-2019*

Medtronic has admitted that it received notice that "HEMs may possess information relevant to the operative complaint" when it was served with Relators' revised first set of RFPs in May 2019.  *See* ECF No. 229-2 at 31.  However, two—Mike Neal and William Paul Harris—were not added to the legal hold for this case in mid-2019, when the five discussed above were added.  Neal was added over three years later, on August 30, 2022, *see* ECF No. 229-6, ¶ 5(k), and Medtronic offers no explanation as to why the likelihood that he would have relevant information was not clear to it in May 2019.  William Paul Harris was never added.[17]  *See* ECF No. 229-7, ¶ 9

---

[16] Without more from Relators, who bear the burden of proof on this issue, the undersigned will not extrapolate from the fact that Medtronic included two "economics and reimbursement professionals" in its initial hold, ECF No. 231-2 at 16, that Medtronic reasonably should have known that the HEMs at issue now were key players likely to have relevant information at the time it received notice of this case.

[17] Medtronic asserts that William Paul Harris was not placed on legal hold for this case "[b]ecause of confusion between [him] and Paul T. Harris."  ECF No. 229-7, ¶9 n.4.  But Medtronic does not explain why it confused two employees in different positions—Paul T. Harris was a district sales manager, *see* ECF No. 229-6, ¶ 5(h), William Paul Harris a Health Economics Manager, *see* ECF No. 227-7, row 4—and different first names.  Indeed, the legal hold database apparently included employees' names, email addresses, and positions, among other things.  *See* ECF No. 227-2 at 17; *see also* ECF No. 227-30 at 30.  A sophisticated enterprise like Medtronic, with tens of thousands of

& n.4.  The undersigned finds that these two custodians should have been, but were not, added to the hold in May 2019.

Mike Neal left Medtronic in 2015.  *See* ECF No. 227-5, row 15.  His electronic account was apparently on a legal hold in a different matter, so that his Enterprise Vault data was copied to Microsoft Exchange.  *See id.*  When the hold in the other case was lifted on January 9, 2017, *see id.*, row 15 & n.iii, his data in Microsoft Exchange became subject to Medtronic's two-year document retention policy, *see* ECF No. 229-9, ¶ 9.  By the time he was added to the hold for this case in 2022, his data would already have been deleted from Microsoft Exchange (because he had left Medtronic more than two years prior), and Enterprise Vault was no longer extant, having been decommissioned in February 2021.  *See* ECF No. 229-9, ¶ 22.  However, if he had been added to the legal hold in this case in May 2019, his data would have been available to be recovered from Enterprise Vault at that time.[18]  William Paul Harris, who left Medtronic in June 2015, was not, apparently, subject to any other litigation holds, which means his data would not have been copied from Enterprise Vault to Microsoft Exchange.  *See* ECF No. 227-5, row 7.  However, as with Neal, had he been added to the hold in this case in May 2019—before the decommissioning of Enterprise Vault—his data, too, would have been available on that platform for copying at that time.

---

employees and tens of thousands on legal holds, should have processes in place to prevent confusion about employees with similar names, perhaps especially when the names are common, like "Harris."  The undersigned does not, therefore, excuse Medtronic's asserted "confusion."

[18] To the extent that Relators argue, as to any of the impacted custodians discussed, that Medtronic should have extended legal holds from other matters once the need for retention of records in those matters had expired, *see* ECF No. 227-2 at 18 (complaining that certain custodians "were on holds for other matters when Medtronic was served with the Complaint in August 2016 but were then *removed* from those holds while this litigation was underway," causing their records in Microsoft Exchange to become "vulnerable to email retention/deletion policies"), that argument is rejected.  As Medtronic points out, "there is nothing improper about releasing a hold once the duty to preserve has terminated."  ECF No. 229-2 at 33.

### c.       Support Link Personnel

James Clausen, Nohemi Haben, Annette Langer, Audrey Medlo, and Amy Mroczek are all identified as Support Link personnel.  *See* ECF No. 227-55 at 7; ECF No. 227-57 at 2; ECF No. ECF No. 227-5, rows 3–4, 11, 14; ECF No. 227-7, rows 1–2, 7–8, 10.  Langer was placed on legal hold for this case on July 10, 2019.  *See* ECF No. 229-6, ¶ 5(f).  Clausen, Haben, and Mroczek were placed on legal hold for this case on July 7, 2022.  *See id.*, ¶ 5(j).  Medlo was placed on legal hold for this case on October 23, 2022.  *See id.,* ¶ 5(*l*).

As discussed above, the operative complaint makes clear that the conduct of Support Link personnel is at issue in this litigation.  *See* Section III.A.2.a, *supra*; *see also* Section I.A, *supra*.  More, several of Relators' initial RFPs from October 2016 specifically mentioned Support Link.  *See* ECF No. 229-5 at 28–30 (seeking, among other things, documents relating to "instructions, advice, and/or information provided to . . . SupportLink Representatives" regarding recruitment of physicians and patients; "provided to . . . SupportLink Representatives" concerning assessment of patient symptoms; "relating to the reasons for the creation of SupportLink"; "created by SupportLink Representatives"; "relating to the development of the Standing Order";[19] and "relating to the SupportLink pilot").  Medtronic asserts that it was put on notice that Support Link representatives should be subject to legal holds in May 2022 when Relators served their second set of RFPs and second set of Interrogatories, which sought, among other things, identification of all Support Link representatives and documents "sufficient to identify . . . SupportLink Representatives."  *See* ECF No. 229-2 at 16 (quoting ECF No. 229-5 at 70); *see also* ECF No. 229-5 at 78.  It neglects to mention, however, that *both* the October 2016 RFPs *and* the May 2019 RFPs included a request seeking precisely the same information.  *See* ECF No. 229-5 at 30 (seeking

---

[19] Support Link personnel were directed to "urge all physicians to sign" the standing order.  ECF No. 18, ¶ 86.

"[a]ll documents sufficient to identify . . . Medtronic SupportLink Representatives"), 44–45 (same). Medtronic does not explain why such a request was *insufficient* to put it on notice in October 2016 (or May 2019), but *sufficient* to do so in May 2022.[20] Accordingly, the undersigned finds that Clausen, Haben, Langer, Medlo, and Mroczek should have been added to the legal hold for this case at or around the time of the initial holds in September 2016.

Clausen and Haben left Medtronic in 2015 and 2014, respectively. *See* ECF No. 227-5, rows 3–4. They were not subject to any legal holds, so their data was not collected from Enterprise Vault. When they were added to the legal hold for this case in July 2022, Enterprise Vault had been decommissioned so no data was recoverable. *See* ECF No. 229-9, ¶ 22. Had they been added to the hold in September 2016 (when the initial holds were imposed), their data would have been available from Enterprise Vault at that time. Medlo left Medtronic in May 2015, but was subject to a legal hold that was lifted in March 2019, at which point her data on Microsoft Exchange was deleted. *See* ECF No. 227-5, row 12. It was too late to retrieve her data from Enterprise Vault when she was placed on hold in this case in October 2022. Mroczek left Medtronic in July 2016. *See id.*, row 14. She was subject to a legal hold in another matter from May 2019 to September 31, 2021. *See id.* When that hold was lifted, her data was deleted from Microsoft Exchange because it was all more than two years old. By the time she was added to the legal hold in this case, her data could not be collected from Enterprise Vault because it had been decommissioned. Had she been under a hold in this case in September 2016, her Enterprise Vault data would have been available at that time. Thus, the untimely holds as to these custodians resulted in deletion of all the data from their custodial accounts.

---

[20] To be sure, discovery was stayed shortly after those initial RFPs were served. However, that does not mean that those requests were incapable of providing notice to Medtronic. More, those RFPs were the operative discovery requests for more than two-and-a-half years, until Relators served a revised set in May 2019. *See* ECF No. 229-5 at 36–46

Langer has a slightly different story because, unlike Clausen, Haben, Medlo, and Mroczek, she was added to the legal hold in this case in July 2019, while Enterprise Vault was still extant. Specifically, she left Medtronic on January 4, 2015. *See* ECF No. 227-5, row 11. She was on hold for another matter from July 2011 to January 9, 2017, when her Microsoft Exchange data became subject to the two-year document retention policy. *See id.* At that point, because her data in Microsoft Exchange was more than two years old, it was deleted. Although Enterprise Vault was available when she was added to the hold in this case, her data was inadvertently not recovered from that platform. Had she been added to the hold for this case in September 2016, her data would not have been deleted from Microsoft Exchange and there would have been no need to look to Enterprise Vault. Accordingly, although when she was placed on hold in this case, her data was still available from Enterprise Vault, rather than grouping her with the custodians identified in Section III.A.1, *supra*, whose data was lost due only to imperfections in Medtronic's data migration process, the undersigned finds that her late addition to the hold and the attendant destruction of her records under the two-year records retention policy caused the loss of her records.

### d. Cindy Kent

Cindy Kent was a marketing manager in the Gastro/Uro marketing unit, which marketed InterStim, and then Vice President and General Manager of Gastro/Uro therapies. *See* ECF No. 227-5, row 9. She was added to the legal hold for this case on October 23, 2022. *See* ECF No. 229-6, ¶ 5(*l*).

One of the major focuses of the operative complaint is the allegedly inappropriate marketing of InterStim. *See, e.g.*, ECF No. 18, ¶¶ 1 (alleging that Medtronic engaged in fraudulent conduct "in connection with its marketing and sales support" of InterStim), 4 (alleging that

Medtronic "markets InterStim irrespective of the efficacy of the treatment for individual patients"), 42 (alleging that Medtronic "has developed and implemented an aggressive marketing and sales support plan" for InterStim), 45 (discussing Support Link as "a marketing program through which Medtronic asks physicians to agree to sign a 'standing order' delegating responsibility" to Support Link representatives). Relators' October 2016 RFPs sought documents relating to Medtronic's training of its sales and Support Link representatives regarding the sale of InterStim and "[m]arketing and promotional instructions and materials" provided to those representatives. ECF No. 229-5 at 28. It would be only reasonable for Medtronic to believe that marketing personnel from the unit responsible for InterStim would likely have information relevant to Relators' claims—and, again, Medtronic does not provide any explanation for why Kent was not put on legal hold in this case until 2022, stating only that "Kent . . . [was] reasonably added to the legal hold after Enterprise Vault was decommissioned." ECF No. 229-2 at 21. As above, that should have occurred around the time of the initial holds in this case.

Kent left Medtronic in 2013 but was on a legal hold in another matter from 2010 to January 2017. *See* ECF No. 227-5, row 9. At that point in 2017, her data on Microsoft Exchange would have been deleted because it was more than two years old. When she was added to the hold in this case in October 2022, Enterprise Vault had already been decommissioned. *See* ECF No. 229-9, ¶ 22. Had she been added to the legal hold in this case in September 2016 (when the initial holds were imposed), the data in her custodial account would have been available at that time.

### e.    *Annette Mittelmark*

According to Relators—without contradiction from Medtronic—Anne Mittelmark was "a manager in Medtronic's 'Medical Education' department responsible for the training Medtronic

provided to physicians on InterStim." ECF No. 227-2 at 33. She was placed on legal hold in this case on April 20, 2020. *See* ECF No. 229-6, ¶ 5(g).

Medtronic indicates that it was made aware of the relevance of physician training when it received Relators' first set of Interrogatories in March 2020, which "sought identification of management-level employees with knowledge of . . . training physicians." ECF No. 229-2 at 15; *see also* ECF No. 229-5 at 54. But, as Relators note, the operative complaint alleges that Medtronic's sales representatives coached physicians about how to convince patients to be screened for InterStim as part of the company's scheme to "insinuate[] itself into the doctor-patient relationship." *Staggers*, 2019 WL 13132849, at *2; *see* ECF No. 18, ¶¶ 50–56, 71–75. More, Relators' first set of RFPs, served in October 2016, sought "[a]ll [d]ocuments relating to what information to communicate or not communicate to the physician, including what documentation, if any, to provide or not to provide to the physician, concerning . . . the assessment of his/her patient's voiding history and symptoms based on InterStim testing results." ECF No. 229-5 at 29. Medtronic does not explain why that was insufficient to put it on notice that managers in the department guiding physician training were reasonably likely to have relevant information.

Mittelmark is apparently still employed at Medtronic. *See* ECF No. 227-5, row 13. She was on a legal hold in a different matter from July 2013 until May 16, 2018, and placed on hold in this case on April 20, 2020. *See id.* At that point, the only data that would have been retained in Microsoft Exchange would have been from April 2018 onward. Had she been placed on a legal hold for this case in 2016, however, the two-year document retention policy would not have applied to her data in Microsoft Exchange.[21]

---

[21] Like Langer, discussed above in Section III.A.2.c, when Mittelmark was added to the legal hold for this case, her data could have been, but was not, recovered from Enterprise Vault. Like Langer, the undersigned finds that it is more appropriate to group her with those whose late placement on legal hold resulted in loss of data, rather than those whose loss of data was due only to flaws in the migration process.

*     *     *     *     *

In sum, Medtronic's placement of legal holds on Handke, Kurtz, Santiago, Wimmer, and Wittek in mid-2019 was appropriate. The loss of their data was not, therefore, caused by an unreasonable delay. On the other hand, Medtronic did unreasonably delay instituting legal holds for Clausen, Haben, Kent, Langer, Medlo, Mittelmark, Mroczek, and Neal. It also unreasonably neglected to put a legal hold on William Paul Harris. That negligence resulted in the loss of some or all of the data from the accounts of those nine impacted custodians.

### B.      Restoration or Replacement of Lost ESI

As the advisory committee for the Federal Rules of Civil Procedure explains, "[b]ecause electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Thus, "Rule 37(e) is . . . applicable [only] when lost ESI is irretrievable from another source, including other custodians." *Borum*, 332 F.R.D. at 46. But, as other courts have held, "The question is whether the *electronically stored information* can be restored or replaced," not whether a litigant could obtain similar information by, for example, "obtaining statements from witnesses." *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 622 (N.D. Ill. 2022) (emphasis in original); *Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*, No. 14-cv-1064, 2017 WL 1214424, at *3 (D.D.C. Mar. 30, 2017) (similar). It is the moving party's burden to show that lost ESI is not replaceable or restorable. *See, e.g.*, *Webb v. Daymark Recovery Servs., Inc.*, No. 21-cv-424, 2022 WL 17832160, at *4 (M.D.N.C. July 26, 2022) (noting that it is the burden of the moving party "to demonstrate that the ESI is lost and irretrievable"), *report and recommendation adopted*, 2022 WL 19001534 (M.D.N.C. Oct. 31, 2022).

34

Here, Relators assert—without explicit contradiction from Medtronic—that hundreds of thousands of records from the accounts of the custodians now at issue were destroyed: specifically, over 189,000 from Kent's account, over 160,000 from Langer's account, over 78,000 from Medlo's account, over 112,000 from Mittelmark's account, over 16,000 from Mroczek's account, and over 42,000 from Neal's account; they have been unable to determine how many were deleted from the accounts of Clausen, Haben, or William Paul Harris.[22]  *See* ECF No. 227-5, rows 3–4, 7, 9, 11–15.  Medtronic contends that some of that ESI is retrievable because "many thousands of emails were, in fact, replaced from other custodians' mailboxes."  ECF No. 229-2 at 36.  Recall that, after it realized that ESI of the impacted custodians had been lost, Medtronic performed searches of "all custodians with ESI preserved for this litigation" to find "emails and other mailbox records for the Impacted Custodians that [were] preserved for this litigation in the mailboxes of other Medtronic employees placed on legal hold."  ECF No. 229-10, ¶¶ 3–4.  To do so, it searched for emails in which any of those custodians "appeared in either the email 'Header' field ('To,' 'From,' 'CC,' or 'BCC') or within the body text (using 'dtSearch' parameters)."  *Id.* ¶ 4.  As to the impacted custodians still at issue, it found 124,026 records related to Kent of over 189,000 destroyed; 67,181 related to Langer of over 160,000 destroyed; 33,106 related to Medlo of over 78,000 destroyed; 42,181 related to Mittelmark from over 112,000 destroyed; 3,522 related to Mroczek from over 16,000 destroyed; and 19,036 related to Neal from over 42,000 destroyed.  *See* ECF No. 229-11 at 2; ECF No. 227-5.  Medtronic also located 4,613 documents related to Clausen; 1,154 related to Haben; and 28,437 related to William Paul Harris.  *See* ECF No. 229-11 at 2.

---

[22] Relators drew the quantities of destroyed records from information Medtronic provided, *see* ECF No. 227-5 at 8 n.v; Medtronic has not challenged those numbers.  It is unclear why the numbers are unavailable for Clausen, Haben., and Willima Paul Harris.

Relators assert that "Medtronic's method grossly overcounts" the recovered records, *see* ECF No. 231-2 at 20, but, even if it did not, it is undisputed that many thousands of emails remain unaccounted for. And that is what matters. For example, in *Borum*, Judge Contreras found that emails were not retrievable from another source where, although the plaintiff had "identified alternate copies and produced a substantial number of" deleted emails "at least some responsive emails were likely irremediably lost." 332 F.R.D. at 46. Because the plaintiff could not "fully recover" the emails, "no amount of discovery [would] confirm the extent to which information was lost." *Id.* Accordingly, that was deemed sufficient for the defendant to show that the ESI could not be restored or replaced.[23] *See id.*; *see also, e.g.*, *Paisley Park Enters. v. Boxill*, 330 F.R.D. 226, 235–36 (D. Minn. 2019) (finding that "the missing [ESI] cannot be replaced or restored" where other sources could not provide "a complete record of [the] defendants' written communications"); *accord Owens v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 695 F. Supp. 3d 750, 760 (M.D. La. 2023); *Lokai Holdings*, 2018 WL 1512055, at *12. So it is here. Relators have sufficiently established that at least some of the ESI cannot be restored or replaced. Where "the lost ESI cannot be restored or replaced by additional discovery, then the

---

[23] Medtronic faults Relators for "fail[ing] to undertake any effort to restore or replace the ESI they claim is 'lost,'" asserting that they "had ample opportunity to depose any of the 'key' custodians for whom custodial ESI is unavailable, but they declined to do so" and that they "failed to follow up on subpoenas for records from third parties that may have contained such communications." ECF No. 229-2 at 35–36. First, as noted above, "obtaining statements from witnesses is *not* what Rule 37(e) meant by 'restored or replaced through additional discovery.' The question is whether the *electronically stored information* can be restored or replaced." *Hollis*, 603 F. Supp. 3d at 622 (quoting Fed. R. Civ. P. 37(e); *see also Lokai Holdings*, *LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055, at *12 (S.D.N.Y. Mar. 12, 2018) ("Testimony itself . . . cannot be deemed equivalent to the missing documents."). It is not clear on what Medtronic bases its assertion that Relators "failed to follow up on subpoenas for records from third parties," but the undersigned notes that Medtronic itself submitted two of Relators' subpoenas that appear to seek communications that might overlap with those that were deleted from some custodians now at issue. *See* ECF No. 229-5 at 140–62. Medtronic further complains that Relators did not "agree[] to Medtronic's repeated offers to provide Relators with the additional discovery of their choice or to Medtronic's specific proposal for additional discovery." ECF No. 229-2 at 36. But even Medtronic does not suggest that any further discovery is likely to "fully recover" the emails. *Borum*, 332 F.R.D. at 46.

inquiry turns to the appropriate sanctions under the subsequent provisions of Rule 37(e)." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 109 (E.D. Va. 2018).

### C.       Prejudice and/or Intent to Deprive

To impose curative measures under Rule 37(e)(1), the court must find that the moving party suffered prejudice from the loss of the ESI at issue. *See* Fed. R. Civ. P. 37(e)(1). If the court finds that the party that destroyed the ESI "acted with the intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2), prejudice may be presumed and the court may "use [the] specified and very severe measures" set out in the Rule to address the intentional deprivation, *id.* advisory committee's note to 2015 amendments. The undersigned addresses the question of intent first.

#### 1.       Intent to Deprive

As noted, to unlock the sanctions of Rule 37(e)(2), the moving party has "the burden of proving 'intent to deprive,' rather than ordinary or gross negligence." *Borum*, 332 F.R.D. at 48 (quoting *Rhoda*, 2017 WL 4712419). "This intent standard is stringent and does not parallel other discovery standards." *Id.* (citation modified) (quoting *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017)). Indeed, courts have refused to find intent to deprive where the evidence is merely "capable of more than one interpretation." *Lokai*, 2018 WL 1512055, at *16.

Relators' evidence of intent to deprive focuses on Medtronic's evolving explanations as to why it no longer had access to ESI from the accounts of certain custodians at issue in this motion, including morphing assertions about its document retention policies, and its resistance to Relators' attempts to probe the circumstances of the deletion of that ESI. *See* ECF No. 227-2 at 20–25, 50–51. Relators also point to Medtronic's alleged "dereliction of preservation duties" by, for example, deleting Enterprise Vault. *See id.* at 48–50. However, the undersigned has already found that

Medtronic made reasonable efforts to preserve records from Enterprise Vault before deleting it; for the same reasons the Court finds those efforts reasonable it finds that they are not evidence of an intent to deprive. *See* Section III.A.1, *supra*. In any case, Medtronic's misstatements about document retention policies and the like appear to be the result of incompetence and communication failures rather than a long-range plan to cover-up its intent to deprive Relators of evidence. For example, Elizabeth Rauker, Medtronic's Global Information and Discovery Management Senior Program Manager, explained that she had made a misstatement in a declaration in this case about how soon after employees left Medtronic their records were destroyed, but corrected it after speaking with IT personnel. *See* ECF No. 227-47, ¶ 5. She further testified that she had made misstatements about Medtronic's retention of data because she mistakenly based her answers on systems in place in Microsoft Exchange, rather than those of the prior platform, Enterprise Vault. *See* ECF No. 229-5 at 114. Where conduct "can be adequately attributed to incompetence," courts "should not infer malice." *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 624 (N.D. Ill. 2022) (quoting *Raila v. Cook Cnty. Officers Electoral Bd.*, No. 19 C 7580, 2021 WL 5179913, at *1 (N.D. Ill. Nov. 8, 2021)). Accordingly, courts have found similar evidence of misstatements and changing explanations fails to meet Rule 37(e)(2)'s stringent intent standard. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 525 (S.D.N.Y. 2022) (noting that courts have "found 'insufficient evidence that [parties] acted with an intent to deprive" notwithstanding "misleading and contradictory explanations for the[] failure to properly preserve evidence" (quoting *Leidig v. Buzzfeed, Inc.*, No. 16 Civ. 542, 2017 WL 6512353, at *11–12 (S.D.N.Y. Dec. 19, 2017)); *Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 67 (S.D.N.Y. 2020) (finding that a "protracted disregard of the[] obligation to preserve, search, and produce relevant evidence, . . . a

38

lack of basic technical competence," and "accompanying obfuscations and misdirections" did not "show[] an entitlement to subsection (e)(2) sanctions").

As to the conduct that *could* in this case be the basis for a spoliation sanction—Medtronic's untimely placement of legal holds on nine custodians—Relators complain that Medtronic fails to explain those failures. *See* ECF No. 227-2 at 50 (stating that Medtronic "does not explain why it took six years to realize, for example, that Cindy Kent—the Vice President and General Manager in charge of the InterStim sales and marketing units—and Mike Neal—a HEM advising Phase 1 physicians on the submission of Medicare claims—could have relevant information."). "However, the failure to institute a legal hold is generally insufficient to support a finding of intent to deprive." *Ocasio v. City of Canandaigua*, No. 18-cv-6712, 2025 WL 1064721, at *9 (W.D.N.Y. Apr. 9, 2025); *see also, e.g.*, *Eshelman v. Puma Biotech., Inc.*, No. 16-cv-18-D, 2017 WL 2483800, at *5 (E.D.N.C. June 7, 2017) (finding that failure to issue a litigation hold "does not rise to the level of intentional conduct required by Rule 37(e)(2)"). Rather, to establish intent to deprive, Relators would have to offer evidence that Medtronic "failed to institute a litigation hold because it wanted [the] emails to be deleted so that [Relators] cold not use them in litigation against it." *Brittney Gobble Photography, LLC v. Sinclar Broad. Grp.*, 18-cv-3403, 2020 WL 1809191, at *9 (D. Md. Apr. 9, 2020). The mere fact that certain custodians were overlooked and thereby placed under delayed legal holds is insufficient.

Finally, Medtronic has put significant effort into trying to replace the missing ESI and has had some success in doing so. *See, e.g.*, ECF No. 229-10, ¶ 4 (describing searches run by Medtronic to "identify and quantify emails and other mailbox records for the Impacted Custodians that are preserved for this litigation in the mailboxes of other Medtronic employees placed on legal hold" and their results). Courts have found that a party's attempts to retrieve destroyed ESI weighs

against a finding of intent to deprive. *See, e.g.*, *Europe v. Equinox Holdings*, 592 F. Supp. 3d 167, 179 (S.D.N.Y. 2022); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13-cv-2581, 2021 WL 4190628, at *19 (S.D.N.Y. Aug. 18, 2021).

In sum, Relators have failed to show that Medtronic had the intent to deprive them of the use in this litigation of the lost ESI at issue.

### 2. Prejudice

The Court having found that Medtronic did not intend to deprive Relators of the lost information's use in this litigation, the severe sanctions listed in Rule 37(e)(2)—a mandatory or permissive presumption that the lost information was unfavorable to Medtronic, dismissal, or entry of a default judgment—are unavailable. *See* Fed. R. Civ. P. 37(e)(2). However, "upon finding prejudice" to Relators, the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Thus, the next question is what a party must show to demonstrate prejudice. It is clear from the structure of the Rule that a party must do more than establish that the ESI that was irretrievably lost was *relevant*. As the court in *Flores v. AT&T Corp.* explained:

> [T]he construction of Rule 37(e) . . . requires that the four predicate elements, including relevancy and the inability to be restored or replaced, be found *before* a court can consider prejudice. If . . . the existence of lost evidence which is relevant and which cannot be replaced means there is prejudice, it would be unnecessary for Rule 37(e) to require a court to find the four predicate elements *before* a court could find prejudice and order measures to cure the prejudice under Rule 37(e)(1).

No. 17-cv-318, 2018 WL 6588586, at *7 (W.D. Tex. Nov. 8, 2018). To be sure, courts should be careful not to place too heavy a burden on "the party that did not lose the information." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. However, a court may not merely presume prejudice from the fact that relevant ESI has been lost. Accordingly, courts may require some evidence that the lost ESI would likely have been favorable to the moving party. *See, e.g.,*

*Goldman v. Sol Goldman Invs. LLC*, No. 20-cv-6727, 2022 WL 2118199, at *4 (S.D.N.Y. June 11, 2022) (requiring "some proof []that the evidence would affirmatively support the movant's claim" to establish prejudice under Rule 37(e)(1)); *accord Ellis v. PB Ventilating Systs., Inc.*, No. 23-cv-4629, 2024 WL 4002798, at *3 (E.D.N.Y. Aug. 30, 2024). That is a suitable standard in this case, where hundreds of thousands of records have already been produced by Medtronic in Phase 1 discovery alone and Medtronic has gathered "lost" records from the custodial accounts of relevant employees recovered from other, preserved accounts, and produced and/or offered to produce such records to Relators. *See, e.g.*, ECF No. 227-20. That is, there is an available source of information which Relators can use to argue that the lost emails would have been favorable to them. Indeed, Relators explicitly acknowledge that the "content of emails recovered from other sources is probative of the contents of lost emails."[24] ECF No. 227-2 at 43 (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 437 (S.D.N.Y. 2004)).

Recall that the lost ESI now at issue comes from nine custodians: Harris (William Paul) and Neal—Health Economics Managers; Kent—a manager in the InsterStim sales and marketing unit; Clausen, Haben, and Mroczek—"call center agent[s]" for the Support Link pilot; Langer—a Support Link operations manager; Medlo—an administrative professional on the Support Link team; and Mittelmark—a medical education manager. ECF No. 227-5, rows 3–4, 7, 9, 11–15. It is only prejudice from the loss of records related to these nine impacted custodians that matters. Alleged prejudice caused by the unavailability of records from any of the other custodians cannot

---

[24] Relators maintain that to establish prejudice, the moving party must merely "come forward with plausible, concrete suggestions as to what the destroyed evidence might have been." ECF No. 227-2 at 41 (citation modified) (quoting *Borum*, 332 F.R.D. at 47). To the extent Relators believe that means they need do no more than hypothesize that relevant evidence might have been lost, the undersigned disagrees. As noted, a mere showing of relevance is insufficient. And even the requirement of "plausible, concrete suggestions" indicates some evidence should generally be presented. *See, e.g.*, *Snider v. Danfoss, LLC*, No. 15-cv-4748, 2017 WL 2973464, at *5 (N.D. Ill. July 12, 2017) ("To evaluate prejudice, the court must have some evidence regarding the particular nature of the missing ESI."), *report and recommendation adopted*, 2017 WL 3268891 (N.D. Ill. Aug. 1, 2017)

support a curative instruction because Relators have not met the "threshold requirements" of Rule 37(e) as to them. *DR Distribs.*, 513 F. Supp. 3d at 958. The Court will address in turn the Relators' showing as to each of the nine custodians at issue.

> a.    *Prejudice Related to Destruction of Data from Health Economics Managers Neal and Harris*

Relators argue that the destruction of records from HEMs caused prejudice for two reasons: First, Medtronic has asserted that HEMs "trained the sales force and advised InterStim customers to comply with Medicare coverage requirements" related to pre-implantation testing so, Relators say, their records would be likely to show whether they truly promoted such compliance. ECF No. 227-2 at 42 (citing declaration of HEM Jerry Santiago, ECF No. 227-49, ¶ 2). Second, Medtronic has asserted, in connection with its argument that any role it may have had in causing false claims was unintentional, that it was unaware prior to Medicare audits in 2017 that "copies of voiding diaries were required to be scanned into the medical records in order for InterStim to be covered." *Id.* For that reason, Relators argue that the records from HEMs, who communicated with the Centers for Medicare and Medicaid Services regarding reimbursement, would be likely to show whether Medtronic's assertion is true and what Medtronic understood about such requirements. *Id.* at 42–43 (quoting ECF No. 227-49, ¶ 7).

Relators offer no evidence to support their first theory, but have some to support their second. There is a 2012 email from a Senior HEM advising other personnel—including Neal— that "payers" (which include Medicare) have been requesting additional documentation to establish that InterStim implantation is medically necessary and that "voiding diaries, bladder questionnaire[s], and prior authorization form[s] are great tools." *See* ECF No. 227-64 at 2. That is precisely the type of evidence that suggests emails from other HEMs—of which Neal and Harris are two—might contain similar statements. And although only just barely, the Court finds it is

sufficient to support Relators' burden of putting forth "some proof" at this juncture that the lost ESI would likely have been favorable to them. *Goldman v*, 2022 WL 2118199, at *4. Accordingly, the undersigned finds that Relators have established prejudice from the destruction of the custodial data of Neal and Harris.

> b.      *Prejudice Related to Destruction of Data from Kent*

Relators contend that emails of senior managers like Kent "would likely show they knew [the] misconduct Relators allege was widespread." ECF No. 227-2 at 44. As evidence, they cite a 2012 email to Jason Christos, the Director of Marketing of the unit responsible for InterStim from a colleague expressing concern that sales representatives were "coercing patients who have had marginal results into implants." ECF No. 227-13 at 3. At the time of that email, it appears that Kent was either the Vice-President of Marketing for that unit or the Vice-President and General Manager of that unit. *See* ECF No. 227-5, row 9. As above, the undersigned finds this sufficient—if only barely—to establish prejudice.

> c.      *Prejudice Related to Destruction of Data of Support Link Custodians*

The Support Link custodians at issue are call center agents Clausen, Haben, and Mroczec; Support Link operations manager Langer; and Support Link administrative professional Medlo. Relators support their argument that they suffered prejudice from the destruction of the records of these custodians by citing two documents. The first is an intake script for the use of Support Link representatives, effective August 2014. *See* ECF No. 227-66. Known as "Warm Intake," it reminds representatives to "[r]emember the patient's feelings[] about their progress and document. This information is just as important as the data being collected." *Id.* at 8. The second is an email exchange also from August 2014 between a Support Link representative and a Support Link manager discussing "the 'warm and fuzzy' balance vs. the objective data." ECF No. 227-67 at 2.

43

Although noting that the parties disagree on the interpretation of these communications, Relators allege that the "tactics" described were attempts by Support Link personnel to "influence patients' perception and reporting of symptom improvement." ECF No. 227-2 at 46. Indeed, allegations of such influence by Support Link representatives are featured in the amended complaint. *See, e.g.*, ECF No. 18, ¶ 88.

Clausen, Langer, and Mroczek were Support Link personnel at or soon after the implementation of this "Warm Intake" policy. *See* ECF No. 227-5, rows 3 (Clausen employed May to July 2015), 11 (Langer employed October 2005 to January 2015), 14 (Mroczek employed early 2013 to July 2016). Medlo was also involved in Support Link at the time but apparently primarily to collect so-called standing orders, all of which have been produced. *See* ECF No. 227-5, row 12 (Mroczek employed January 2006 to May 2015); ECF No. 227-2 at 32 (asserting the Medlo oversaw the collection of standing orders); ECF No. 229-2 at 47 (stating that all standing orders have been produced). Relators do not even suggest there would be similar evidence in her emails. *See* ECF No. 227-2 at 46 (stating that Clausen, Haben, Mroczek, and Langer would have useful evidence). Haben left Medtronic months before the implementation of "Warm Intake." *See* ECF No. 227-5, row 4 (stating that Haben left Medtronic in April or May 2014). The undersigned therefore finds that Relators have established prejudice from the destruction of only Clausen, Langer, and Mroczek's emails.

### d.    Other Assertions of Prejudice

The Court has determined that Relators have demonstrated prejudice as to six of the nine impacted custodians at issue: Neal, William Paul Harris, Kent, Clausen, Langer, and Mroczek. It has further determined that their showing as to Medlo and Haben is insufficient. Relators make no argument and present no evidence that Mittelmark's lost ESI would likely have been favorable

44

to their case. *See* ECF No. 227-2 at 41–47; *see also Goldman*, 2022 WL 2118199, at *4 (requiring "some proof" that the evidence would affirmatively support the movant's claim to establish prejudice under Rule 37(e)(1)); *accord Ellis*, 2024 WL 4002798, at *3.

Relators' other assertions of prejudice either concern custodians not at issue, are unsupported, or both. For example, they note that the emails of Relator Kurdelmeyer's trainers Michael Severn and Paul T. Harris were destroyed, but their records are not at issue any longer because they were not unreasonably deleted, and Relators offer no evidence that their emails would likely include material favorable to Relators' case.[25] *See* ECF No. 227-2 at 43. They claim that they are prejudiced by the destruction of "follow-up[s]" to the email between Christos and the sales representative about "coercing patients," ECF No. 227-13 at 3, but Christos' emails are no longer at issue because they were not unreasonably destroyed. *See* ECF No. 227-2 at 44. They maintain that the destruction of Willemsen's emails "deprives Relators of critical evidence about the goals and implementation of the Standing Order program," *id.* at 45, but his emails (like Christos') are no longer at issue. More, Relators have not provided evidence comparable to that which the undersigned has found sufficient to demonstrate prejudice.

\* \* \* \* \*

In sum, the undersigned finds that Relators have demonstrated prejudice from the destruction of the emails of William Paul Harris, Neal, Kent, Clausen, Langer, and Mroczek, but not of Haben, Medlo, and Mittelmark.

---

[25] Indeed, all Kurdelmeyer's emails have been preserved, so it would appear that any emails between her and either or both of the trainers have not been lost. *See* ECF No. 229-2 at 45. Relators' suggestion that the managers' emails would include helpful "instructions or discussions with others regarding her training" is mere speculation. ECF No. 227-2 at 43.

### E.    Remedy

Rule 37(e)(1) permits a court to impose "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The advisory committee's note suggests some possibilities, such as "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. The court's authority to impose curative measures "does not require the court to adopt measures to cure every possible prejudicial effect" and the choice of remedy "is entrusted to the court's discretion." *Id.*

The evidentiary sanctions Relators seek with respect to the findings of prejudice above are precluding Medtronic from (1) "asserting that, before 2017, it had an incomplete or uncertain understanding of Medicare requirements for the reimbursement of InterStim treatment, or that it was not informed by Medicare contractors or representatives of information relevant" to those requirements; (2) arguing that members of national leadership in the InterStim sales and marketing unit were unaware of any proven misconduct by InterStim sales representatives; and (3) "presenting evidence or argument about the training it provided to Support Link representatives or their communications with patients outside what is reflected in the scripts and policies it produced." ECF No. 227-2 at 42, 44, 46.

The undersigned has considered these requested curative measures, as well as all the other curative evidentiary measures Relators have sought and declines to order them. That decision is driven in part by the fact that Relators are not entirely without evidence supporting their positions on Medtronic's pre-2017 understanding of Medicare reimbursement requirements, management's awareness of misconduct by sales representatives, and Support Link's alleged attempts to influence

46

patients' reports of improvement. *See, e.g.*, ECF No. 227-13; ECF No. 227-64; ECF No. 227-66; ECF No. 227-67. More, in April 2024, Relators asserted in their motion to proceed to nationwide discovery, which was supported by a 116-page statement of material facts and 313 exhibits, that "[t]he evidence already show[ed] . . . the false claims rate for the selected Phase 1 physicians . . . to be more than 90%." ECF No. 151-2 at 9 (emphasis omitted); *see also* ECF Nos. 151-3 through 151-316. And, assuming the case gets to trial, it will be after the period of nationwide discovery; it is not possible to predict the state of the evidence after that discovery. Accordingly, the undersigned will not impose the evidentiary sanctions requested. *See, e.g.*, *Borum*, 332 F.R.D. at 47 (declining to impose evidentiary sanctions where, notwithstanding spoliation of the plaintiff's emails, the defendants were not "altogether barred from testing" the plaintiff's allegations with other evidence).

Instead, the undersigned finds it appropriate to "permit[] the parties to present evidence and argument to the jury regarding the loss of information" from William Paul Harris and Neal as to Medtronic's pre-2017 understanding of Medicare reimbursement requirements; from Kent as to her knowledge of misconduct by InterStim sales representatives; and from Clausen, Langer, and Mroczek as to their interpretation of the 2014 "Warm Intake" policy. *See* Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. To be clear, Medtronic may "offer[] evidence [and argument] to counter an adverse inference." *Kalejaiye v. Quality Investigations, Inc.*, No. 19-cv-2647, 2024 WL 1213322, at *6 (D.D.C. Mar. 21, 2024). Based on that showing, the jury will be permitted "to make inferences therefrom." *Id.* This is a "common curative measure" under Rule 37(e)(1), *DR Distribs.*, 513 F. Supp. 3d at 958; *accord BHI Energy I Power Servs. LLC v. KVP Holdings, LLC*, 730 F. Supp. 3d 308, 321 (N.D. Tex. 2024), and one the advisory committee describes as "serious," Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

47

Courts have recognized that it "help[s] 'rectify the imbalance' . . . created by spoliating relevant ESI," as well as "provid[ing] the jury, as finder of fact, with context for that evidentiary imbalance, which is itself relevant evidence going to the parties' credibility and other factual issues." *Harsch v. Blink Health Ltd.*, No. 17-cv-3880, 2019 WL 2708125, at *27 (S.D.N.Y. June 20, 2019); *accord Ocasio*, 2025 WL 1064721, at *10; *Manning v. Safelite Fulfillment, Inc.*, No. 17-cv-2824, 2021 WL 3557582, at *10 (D.N.J. Apr. 29, 2021), *report and recommendation adopted*, 2021 WL 3542808 (D.N.J. Aug. 11, 2021).   Equally importantly, "it leaves the district judge free to determine the precise scope of the spoliation evidence to be permitted at trial and to craft any related jury instructions on a full evidentiary record." *Harsch*, 2019 WL 2708125, at *27; *accord Ocasio*, 2025 WL 1064721, at *10; *Manning*, 2021 WL 3542808, at *10.[26]

Relators also seek reimbursement of the "substantial amounts" in fees they have "incurred . . . over several years investigating and responding to Medtronic's spoliation." ECF No. 227-2 at 52.   Courts in this district (and others) have ordered fee-shifting under the 2015 version of Rule 37(e) to compensate for "the additional time and efforts . . . incurred in . . . litigating the spoliation issue." *Borum*, 332 F.R.D. at 49–50; *see also, e.g.*, *Paisley Park Enters.*, 330 F.R.D. at 237.   In light of the undersigned's wide discretion in crafting a remedy under Rule 37(e), Relators' success (however narrow) on its motion, and Medtronic's failure to address the request for fees, the undersigned will award Relators some measure of its fees and costs incurred in conducting discovery into the spoliation, including preparing for and taking any depositions aimed at establishing the spoliation, and litigating this motion for sanctions. *See, e.g.*,

---

[26] Relators maintain that the Court should also "infer on summary judgment that the destroyed evidence was unfavorable" to Medtronic. ECF No. 227-2 at 51–52.  The undersigned is not ruling on the motion for summary judgment and will not presume to cabin Judge Chutkan's discretion on that issue.  However, Relators' suggestion that they have been prejudiced at the summary judgment stage by missing evidence is significantly undermined by their assertion in April 2024—prior to the close of Phase 1 discovery—that they already had "more than enough evidence to establish a genuine issue of fact as to every element" of the alleged false claims scheme.  ECF No. 151-2 at 6.

*Borum*, 322 F.R.D. at 50 (limiting the recovery of attorney's fees to attorney's fees and costs incurred in "preparing for and conducting the portions" of two depositions "relevant to the spoliation issues" and in litigating the spoliation motion). The amount awarded will account for Relators' limited success on their motion. Fees incurred in litigating the fee issue will also be compensable. *See, e.g.*, *Borum v. Brentwood Village, LLC*, No. 16-cv-1723, 2020 WL 5291982, at *4, *7 (D.D.C. Sep. 4, 2020) (awarding "fees on fees" incurred in connection with a motion under Rule 37(e)). The parties are encouraged to resolve the fee issue short of further litigation. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

## IV.    CONCLUSION

As noted, this is an unusual case—not, perhaps, *sui generis*, but certainly atypical. Medtronic got notice of this litigation amid a complex migration of email communications from one platform to another driven in part by the institution of a document retention policy and subject to an elaborate, but ultimately flawed, process to ensure preservation of necessary records. Because of an extended stay of discovery, the consequences of those flaws on documents likely relevant to this litigation were not discovered for years, at which time Medtronic's legacy platform had been decommissioned. And so, records of several custodians whom even Medtronic believed to have relevant evidence were destroyed. Ultimately, the records rendered unretrievable because of that flawed migration process are not the basis for curative measures or sanctions because, under Rule 37(e) of the Federal Rules of Civil Procedure, a litigant must take only "reasonable steps" to preserve ESI. Medtronic's other missteps—not related to the technical issues with the migration process, but rather to the untimely institution of legal holds—also resulted in the destruction of

49

ESI, the loss of some of which Relators have shown to have caused them some prejudice.  There is, therefore, a basis for curative measures under the Rule.  Accordingly, it is hereby

**ORDERED** that Relators' motion for curative measures and sanctions under Rule 37(e), ECF No. 226, is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that, as a remedy, the parties may present evidence and argument to the factfinder regarding the loss of ESI as set out above in Section III.E.  It is further

**ORDERED** that, within 30 days of the date of this Memorandum Opinion and Order, the parties shall meet and confer and present to the Court a proposal for (1) resolving Relators' request for costs and attorney's fees without further litigation and (2) proposing further proceedings should that effort fail.  It is further

**ORDERED** that, within fourteen days of the date of this Memorandum Opinion and Order, the parties shall meet and confer on appropriate, targeted redactions to it and file a proposed redacted version under seal in this case.

    **SO ORDERED.**

                                                    G. Michael
                                                    Harvey
Date:   March 12, 2026                    _____
                                          G. MICHAEL HARVEY
                                          UNITED STATES MAGISTRATE JUDGE

50